Filed 9/24/20  P. v. Reyes CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER ANDREW REYES,<br><br>     Defendant and Appellant. | E071303<br><br>(Super.Ct.No. INF1702123)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  W. Charles Morgan* and Chad W. Firetag, Judges.  Affirmed in part, reversed in part with directions.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

* Retired Judge of the Riverside Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

1

## INTRODUCTION

Defendant and appellant, Christopher Reyes, appeals from the judgment entered following jury convictions for attempted premeditated murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a)[1]; count 1), first degree residential burglary (§ 459; count 2), and first degree robbery (§ 211; count 3). As to counts 1 and 3, the jury found not true enhancements for personal discharge of a firearm (§§ 12022.53, subd. (c), 1192.7, subd. (c), (8)). The trial court sentenced defendant to 16 years, plus 7 years to life in prison, and stayed the 10-year term for defendant's on-bail enhancements.

Defendant contends there was insufficient evidence to support his convictions for attempted murder and robbery. He also argues the trial court erred in not instructing the jury on self-defense and the habitation defense. Defendant further asserts that this case must be remanded under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), to clarify the contradictory restitution fine orders and to hold an ability-to-pay hearing. In addition, defendant argues he must be awarded one additional day of presentence credit.

We reject defendant's contentions, with the exception of his objection to the contradictory restitution fine orders and custody credit error. We accordingly reverse the trial court's orders imposing fines and fees, and remand this matter to the trial court with directions to reconsider the court's inconsistent orally imposed restitution fines. We also

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

order the trial court to modify its presentence credits order by adding one additional day of presentence credit. The judgment is affirmed in all other regards.

## II.

## FACTS

During the summer of 2017, A.C. worked as a security guard, which required extensive firearms training. He owned three guns, which included two handguns and a 12-gauge shotgun. One of the handguns was a 9-millimeter (9mm) and the other was a .40-caliber handgun. A.C. kept the shotgun in his master bedroom closet and his .40-caliber handgun in the nightstand or attached to a magnet under his desk or table, also in the master bedroom. He kept his 9mm handgun with a full magazine in the garage, affixed to a magnet under a table. A.C. denied owning a .45-caliber gun.

On July 9, 2017, when A.C. and his wife, E.C., returned home from dinner, they noticed lights from two flashlights inside their house, in the front room, which they called the "craft room." A.C. parked curbside, by their home on La Playa Street in Coachella.

After seeing the lights from two flashlights inside his home, A.C. opened his garage door with the remote in his car. While E.C. remained in the parked car, A.C. entered the garage. Nothing appeared amiss in the garage. A.C. checked his security screen monitor in the garage and noticed his cameras were not pointed in their normal direction. A.C. retrieved his handgun from under the table in the garage, pulled the slide, and went outside, over to the front window to check out the lights inside the craft room.

3

A.C. knocked on the front window to see what would happen. The lights went out. A.C. ran back to the garage, crossing the front of his house and entryway.

A.C. testified that because he was employed as a security guard, he instinctively entered his house with his loaded gun to find out what was going on inside and to protect his home. A.C. entered his house through the door from the garage to the laundry room. He then opened the door from the laundry room to a hallway in his house. Almost instantaneously, upon A.C. opening the door to the hallway and stepping halfway inside, A.C. heard more than five gunshots coming from his right side. E.C., who was outside in the car, testified she heard more than 10 gunshots. A.C. noticed in his peripheral vision, to the right, a Hispanic man wearing a white t-shirt and shorts, standing in the living room, halfway outside the sliding door.

A.C. could not remember if he fired his gun or many of the details of the incident because it happened so fast. He was inside for only seconds. Immediately after hearing the shots, he fled out to the garage, placed his gun in the bed of his truck in the garage, and retreated to his car parked on the street. No one followed him outside. A.C. testified he might have fired a bullet or two but could not remember. He had never been involved in a shooting before.

When A.C. reached his car on the street, E.C. was calling 911. She made the call at 9:26 p.m. Upon arrival, sheriff's deputies cleared the house and began investigating the incident. During the deputies' recorded initial entry and clearing of the house, there could be heard what sounded like fireworks or a loud gunshot. Deputy Glaccum testified

4

the deputies found inside A.C.'s home shell casings, bullet holes, and damaged property, "indicative of a gunfight." The house appeared to have been ransacked and several items were missing, including an iPhone, jewelry, a backpack, and $8,000 in cash.

At 10:28 p.m., just over half an hour after law enforcement arrived at A.C.'s home, law enforcement responded to a 911 call from someone on Arica Drive, three streets to the east of A.C.'s home. J.S., who lived on Arica Drive, noticed police vehicles driving by his house. His neighbor said a wounded person had knocked on his door. J.S. checked his backyard to see if anyone was there. J.S. discovered a Hispanic man inside J.S.'s storage shed. He appeared to be about 20 years old. J.S. noticed blood on the chest of the man's white t-shirt. The man asked for J.S.'s phone. J.S. did not give him his phone. J.S. told the man he would be okay and went to get help.

When deputies went out to J.S.'s shed, the man was gone. The deputies observed a blood smear on the shed door, and swabbed the blood. Deputy Glaccum reviewed J.S.'s neighbor's surveillance video, which showed a person wearing a white shirt and dark bottoms walking away from J.S.'s home.

A. *Defendant's Hospitalization*

During the night of the shooting incident, M.M. picked up defendant at a house in Thousand Palms. Defendant was bleeding from a gunshot wound to his right shoulder. Defendant told M.M. not to take him to the nearest hospital. M.M. complied and took him to San Gorgonio Hospital in Banning. At the hospital, defendant told Police Officer Lynn that at midnight, he and his girlfriend and M.M. were driving in M.M.'s car back

5

from Thousand Palms. On the way, they stopped at a Chevron station in Moreno Valley. At the station, defendant got into an argument with a man and punched him. Afterwards, as defendant walked back to his car, the man shot him in the shoulder. M.M. then drove defendant to the hospital.

Deputy Garcia also tried to speak to defendant at the hospital but defendant would not talk to him. Deputy Garcia then investigated the alleged shooting at the Chevron station and did not find any evidence of such a shooting.

B. *Law Enforcement Investigation*

Meanwhile, law enforcement investigated A.C.'s home. Deputies discovered the following evidence: a hand print on the exterior of the master bedroom window, facing the backyard; 25 casings inside and outside A.C.'s house; one .45-caliber casing in the laundry room, behind the washing machine; one .45-caliber casing at the entrance to the craft room; a .223-caliber rifle casing and an Aguila brand 9mm casing in the kitchen area, under the dining room table, to the right of where A.C. entered the hallway; two 9mm casings in the backyard, including a brass Aguila casing and a silver aluminum Luger casing; a pair of black, size 9, Nike tennis shoes in the backyard.

The handgun A.C. grabbed from under the table in the garage was loaded with brass Luger 9mm cartridges. None of the casings found at the crime scene matched the rounds in A.C.'s 9mm handgun. Law enforcement retrieved A.C.'s 9mm handgun from the truck bed. It held a maximum capacity of eight rounds, but only had six 9mm brass Luger rounds in the magazine and one 9mm brass Luger round in the chamber. In the

6

garage, the door of A.C.'s gun safe was wide open, with nothing in the safe. A.C.'s Mossberg shotgun, which he kept in his master bedroom closet, was found in the backyard. A.C.'s .40-caliber pistol was found in A.C.'s master bedroom, where he had left it before the incident.

There was a bullet hole just below chest level, in the wall in the entryway leading from the laundry room to the hallway. There was another bullet hole on the door frame leading to the laundry room, where A.C. was standing during the shooting. There were bullet holes in a wall dividing the guest bathroom from the living room, in the hallway leading to the master bedroom, and in a closet in the guest bedroom. There was a bullet strike to the wall dividing the kitchen from the bathroom, in which the bullet entered through the shower tub and exited the wall. The slider in the kitchen was shattered, with bullet holes in the glass.

Sheriff's Detective Osegura determined that the perpetrators entered A.C.'s home through the master bedroom window in the back of the house. The window screen "protector" had been removed, the window was shattered, and the mini blinds were damaged when moved to the side. Detective Osegura concluded the shooter was walking towards the back wall of A.C.'s backyard, while shooting at the area where A.C. had been standing, in the hallway. Because A.C.'s 9mm handgun had an eight-round capacity, and there were seven rounds remaining in the gun, Detective Osegura concluded A.C. might have fired one round during the incident. However, none of the casings found at the crime site matched the cartridges in A.C.'s 9mm handgun. Detective

7

Osegura determined that A.C.'s .40-caliber handgun had not been fired. In addition, he concluded four separate firearms were fired at A.C., a 9mm gun, a .40-caliber gun, a .45-caliber gun, and a .223-caliber rifle. Osegura also concluded there might have been more than one shooter.

Law enforcement investigators received a Cal ID[2] "fingerprint hit" naming defendant, based on the fingerprints a forensic technician lifted from the exterior of the master bedroom window. Also, DNA analysis was conducted of the blood recovered from J.S.'s shed, where defendant was hiding, and a buccal swab was taken from defendant. The DNA analysis comparing these two samples showed that defendant's DNA profile obtained from the buccal swab showed a "strong match" with the blood on the shed.

C. *The Defense*

Defense firearms expert, Lance Martini, testified regarding deficiencies in law enforcement's investigation. Martini stated there was no firearm or tool analysis involving test firing the guns. The photographic documentation of the cartridges and casings was incomplete. There were no microscopic comparisons of the recovered cartridge cases and there was no gunshot residue analysis. There were also no forensic firearms examination reports. Martini further testified that photographs of the bullet hole in the laundry room door frame and the presence of a .45-caliber casing in the laundry

---

[2] California's computer fingerprint database. (See *People v. Johnson* (2006) 139 Cal.App.4th 1135, 1152.)

room established a high probability that a .45-caliber bullet was fired from within the laundry room.

Martini was unable to determine if the noise recorded during the deputies' initial investigation of A.C.'s house was from a gunshot or a firecracker. He also was unable to determine how many firearms were fired in A.C.'s house. Martini agreed that none of the casings found in the house matched the cartridges in A.C.'s 9mm gun. Martini believed the shots were fired by one or more individuals located in A.C.'s home. If any were fired from outside, toward the house, they might have been directed toward someone standing at the laundry room entrance.

Defendant's mother told Detective Osegura defendant recently injured his shoulder on a fence. At trial, she testified that six months before the shooting incident, defendant was shot in the back through his lungs and in his leg.

D. *Stipulated Timeline*

The parties stipulated to the following times of calls and events recorded by law enforcement:

9:26 p.m. – A.C.'s neighbor called 911

9:26 p.m. – E.C. called 911

9:26 p.m. – A.C. told 911 he was going to enter his house

9:51 and 9:52 p.m. – Deputies announced their presence in the area

9:54 p.m. – Deputies entered A.C.'s neighbor's home

9:55 p.m. – Deputies entered A.C.'s garage with K-9

9

10:00 p.m. – Deputies began clearing A.C.'s home and backyard

10:28 p.m. – 911 call from someone on Arica Drive, down the street from J.S.

10:29 and 10:30 p.m. – 911 calls from J.S.'s residence on Arica Drive

10:30 p.m. – 911 call from J.S.'s neighbor on Arica Drive

10:38 p.m. – 911 call from another person on Arica Drive, down the street from J.S.

10:39 p.m. –  another 911 call from J.S. on Arica Drive.

## II.

## SUFFICIENCY OF EVIDENCE

Defendant contends the evidence was insufficient to support his convictions for attempted murder (count 1) and robbery (count 3).

When reviewing on appeal the sufficiency of evidence supporting a conviction, this court must consider the evidence presented and all logical inferences from that evidence in light of the legal definition of the charged crime.  "Settled principles of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant" committed the crime beyond a reasonable doubt.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)  "The standard of review is the same in cases such as this where the People rely primarily on circumstantial evidence.  [Citation.]"  (*Ibid.*)

10

"'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.'" (*People v. Perez*, *supra*, 2 Cal.4th at p. 1124, quoting People v. *Bean* (1988) 46 Cal.3d 919, 932-933.)

A.  *Attempted Murder*

We conclude there was sufficient evidence to support defendant's attempted murder conviction, as an aider and abettor.  An aider and abettor is one who acts "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560; *People v. Chiu* (2014) 59 Cal.4th 155, 161.)  Penal Code section 31 extends criminal liability as principals in a crime to "'[a]ll persons concerned in the commission of a crime,' . . . whether they directly commit the act constituting the offense, or aid and abet in its commission." (§ 31; see *People v. Perez* (2005) 35 Cal.4th 1219, 1225; *People v. Chiu* (2014) 59 Cal.4th 155, 161.)  "If the defendant himself commits the offense, he is guilty as a direct perpetrator.  If he assists another, he is guilty as an aider and abettor.  It follows, therefore, that for a defendant to be found guilty under an aiding and abetting theory, someone other than the defendant

11

must be proven to have attempted or committed a crime." (*Ibid.*) "Aider and abettor liability is . . . vicarious . . . in the sense that the aider and abettor is liable for another's actions as well as that person's own actions. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

"[A]n aider and abettor's guilt 'is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state.' [Citation.] '"[O]nce it is proved that 'the principal has caused an *actus reus,* the liability of each of the secondary parties should be assessed according to his own *mens rea.*"'" [Citations.] Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez, supra*, 35 Cal.4th at p. 1225.)

"'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.'" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409, quoting *People v. Mitchell* (1986) 183 Cal.App.3d 325, 329.)

1. *Attempted Murder Committed by the Direct Perpetrator*

Defendant's conviction for attempted murder as an aider and abettor is founded on the commission of attempted murder by a cohort. There is overwhelming evidence supporting such a finding.

"First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 166.) "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.]" (*People v. Lee* (2003) 331 Cal.4th 613, 623.)

Here, substantial evidence of attempted willful, premeditated and deliberate murder includes evidence that defendant and his cohorts were alerted to A.C.'s arrival at A.C.'s home when A.C. opened the garage, went over to the front window, and tapped on the glass. The inside flashlights were immediately turned off. This evidence shows that defendant and his cohorts knew that someone saw them inside A.C.'s home.

13

The evidence further supports a reasonable finding that, instead of immediately fleeing out the back of the house upon being observed, defendant and his cohorts decided to ambush A.C. as he entered his home. While A.C. ran across the front yard and entryway, back to the garage, defendant and his cohorts waited for A.C. to enter the house, silently lying in wait, with guns ready to fire.

The evidence shows that the instant A.C. opened the laundry room door to the hallway, defendant's cohorts fired a barrage of bullets at A.C. A.C. testified he saw in his peripheral vision, to his right, a young Hispanic man wearing a white t-shirt. The bullets were flying toward A.C. from the area where the man was standing. During the ambush, over 20 rounds were fired from four guns. One bullet struck a wall just below chest level, in the entryway leading from the laundry room into the hallway, and another bullet struck the door frame leading to the laundry room where A.C. had been standing during the shooting. Evidence of these circumstances provides overwhelming evidence that, even if defendant did not fire one of the four guns at A.C., defendant's cohorts ambushed A.C. in a premeditated attempt to kill him, while defendant was present.

2. *Evidence of Aiding and Abetting*

There is also substantial evidence that defendant aided and abetted in the attempted murder of A.C. An aider and abettor who knowingly and intentionally assists a cohort in attempting to kill someone can "be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and

14

abettor, then, acts with the mens rea required for first degree murder." (P*eople v. Chiu*, *supra*, 59 Cal.4th at p. 167.)

Here, there was substantial evidence defendant had knowledge of the criminal purpose of his cohorts (direct perpetrators) and acted with an intent or purpose either of committing or encouraging or facilitating the commission of premeditated murder of A.C. There was also substantial evidence from which a reasonable inference could be made that A.C. participated in the attempt to kill A.C. Defendant does not contest on appeal his conviction for first degree burglary. This demonstrates there was sufficient evidence supporting the jury's findings that defendant entered A.C.'s home, with intent to commit larceny or any other felony. (*People v. Garcia* (2017) 17 Cal.App.5th 211, 223; see §§ 459, 460, subd. (a).) In addition, during the shooting, A.C. observed from his right peripheral vision, a young Hispanic man wearing a white t-shirt. A reasonable inference could be made that this individual was defendant, because a little over 30 minutes after the shooting, J.S. reported he had found a young Hispanic male wearing a blood-stained white t-shirt, hiding in J.S.'s shed. After J.S. told the man he was going to get help for him, the man disappeared. There was additional evidence that late that same evening or early morning after the shooting, defendant was dropped off at a hospital for treatment of his gunshot wound. The driver testified defendant told her not to take him to a local hospital. From this evidence, a reasonable inference could be made that defendant was shot during the shooting at A.C.'s home, fled, and did not want to go to a local hospital because he did not want to be associated with the shooting incident.

Evidence of defendant's presence during the ambush also includes his handprint on the exterior of the master bedroom window at the back of the house and DNA evidence showing that his blood was on J.S.'s shed. Also, defendant lied to the police at the hospital as to the cause of his injury. In addition, there is evidence that, either A.C. fired one round from his 9mm, striking defendant or, alternatively, defendant was struck by cross-fire from a cohort during the ambush. Either way, there is overwhelming evidence defendant was present during the shooting, fled, and lied about his gunshot wound.

As defendant correctly notes, generally, "neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission." (*People v. Campbell*, *supra*, 25 Cal.App.4th at p. 409.) However, in making the determination of aiding and abetting, this court may consider, among other factors, the defendant's "'presence at the scene of the crime, companionship, and conduct before and after the offense.'" (*Id.* at p. 409, quoting *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.) In addition to overwhelming evidence defendant was present during the ambush, there is evidence he was at A.C.'s home, uninvited, participating in the burglary and attempted murder. Rather than fleeing upon being caught committing burglary, A.C. remained in the house with his cohorts while they ambushed A.C. After A.C. ran out of the house, defendant fled, hid in a shed until discovered, and fled from the shed when discovered there. He then got a ride to a hospital, and lied to the police at the hospital about the cause of his gunshot wound, showing consciousness of guilt. (*People*

16

*v. Edwards* (1992) 8 Cal.App.4th 1092, 1102 ["It is well established that pretrial false statements by a defendant may be admitted to support an inference of consciousness of guilt by the defendant."].)

We conclude evidence of defendant's presence at the crime scene, companionship with the perpetrators of the ambush, participation in the burglary, remaining at the crime scene until after the shooting, and lying about his gunshot wound provides more than ample evidence of defendant's knowledge of his cohorts' unlawful intent to commit premeditated murder and defendant's intent to assist in the crime.

Defendant argues that the evidence, at most, only shows he intended to commit burglary and he did not fire a gun at A.C. The jury found not true the enhancements for personal discharge of a firearm (§§ 12022.53, subd. (c), 1192.7, subd. (c), (8)). This suggests the jury concluded there was insufficient evidence that defendant fired one of the four guns. Even assuming defendant did not fire a gun, there was substantial evidence of his knowledge of his cohorts' intent to ambush and kill A.C., and defendant's intent to assist in doing so. Rather than fleeing after A.C. alerted defendant and his cohorts that they had been observed inside A.C.'s home, defendant remained with his cohorts inside A.C.'s home, lying in wait to ambush A.C. Viewing the evidence most favorably to the judgment, we conclude the evidence was more than sufficient to support defendant's conviction for attempted premeditated and deliberate murder, as an aider and abettor.

B. *Robbery*

Defendant argues there was insufficient evidence supporting defendant's robbery conviction. We disagree.

"'Robbery is the taking of "personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property." [Citation.]' [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943.) The elements of robbery are thus: "(1) defendant took property that was not his own; (2) the property was in the possession of another person; (3) the property was taken from the other person or his or her immediate presence; (4) the property was taken against that person's will; and (5) the defendant used force or fear to take the property or to prevent the person from resisting." (*People v. Merritt* (2017) 2 Cal.5th 819, 824; see Pen. Code, § 211.)

"Although the evidence is circumstantial, the intent required for robbery and burglary is seldom established with direct evidence but instead is usually inferred from all the facts and circumstances surrounding the crime." (*People v. Lewis* (2001) 25 Cal.4th 610, 643; see § 29.2, subd. (a).) Robbery occurs "whether a perpetrator relies on force or fear to gain possession *or to maintain possession* against a victim who encounters him for the first time as he carries away the loot." (*People v. Gomez* (2008) 43 Cal.4th 249, 265, italics added.) "[S]everal appellate courts have affirmed robbery convictions on the grounds that what began with larceny ripened into robbery due to the

defendant's use of force or fear to maintain possession of the property." (*People v. Hodges* (2013) 213 Cal.App.4th 531, 540.)

First, substantial evidence supported the inference that a taking occurred. Defendant does not contest his conviction for first degree burglary, from which it can be inferred there was sufficient evidence to support the jury's finding defendant entered A.C.'s home with his cohorts with intent to steal property from A.C.'s home. A.C. and E.C. testified that, when they entered their home after the shooting incident, their house appeared to have been ransacked and several items were missing, including an iPhone, jewelry, backpack, and $8,000 in cash. A reasonable inference could be made that either defendant or his cohorts took the items when they fled after the shooting. Before the shooting, A.C. saw two flashlights in the craft room, from which it could be reasonably inferred that defendant and his companions were searching for items to steal.

Second, substantial evidence supports the inference that defendant, along with his cohorts, formed the intent to steal from A.C. before, rather than after, they used force against A.C. (*People v. Clark*, *supra*, 52 Cal.4th at p. 945; *People v. Marshall* (1997) 15 Cal.4th 1, 34 [requisite intent to steal must arise before or during the act of force].) Evidence of this element was established by evidence that, when A.C. knocked on the craft room window, A.C. alerted the burglars that he had seen them in his house. Defendant and or his cohorts immediately turned off their flashlights, demonstrating they were aware they had been spotted inside. Rather than, at that point, fleeing with their loot from A.C.'s house, without using force, they elected to wait for A.C. to enter his

19

home, lying in wait with intent to shoot A.C. and then flee with the stolen property. Defendant waited with his cohorts, demonstrating his own intent to participate in, and support his cohorts in shooting A.C. and then fleeing with the stolen property.

The evidence shows that as defendant's cohorts ambushed A.C., defendant stood nearby, aiding and abetting his cohorts, while they used deadly force against A.C., forcing him to leave his home, in fear for his life. The evidence further shows that, after A.C. and his cohorts forced A.C. to retreat, they fled with the stolen property. Although there is no direct evidence defendant took any of the stolen property, there was ample evidence that he knowingly and willingly participated in the robbery, as well as the attempted murder, as an aider and abettor.

## III.

## INSTRUCTIONAL ERROR

Defendant contends the trial court abused its discretion by refusing defendant's request to instruct on self-defense (CALCRIM 505) and defense of habitation (CALCRIM 506). Defendant argues instructions on self-defense and defense of habitation were necessary for the jury to evaluate whether A.C. lawfully entered his home with his gun drawn. Defendant argues there was substantial evidence A.C. acted unlawfully when he entered his home with his gun drawn and, therefore, the burglars were entitled to exercise self-defense and shoot at A.C.

20

A trial court must instruct on all defenses which are supported by the evidence and are not inconsistent with the defendant's theory of the case. (*People v. Baker* (1999) 74 Cal.App.4th 243, 252; *People v. Brooks* (2017) 3 Cal.5th 1, 73.) "'"It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence"' and '"necessary for the jury's understanding of the case."' [Citations.] It is also well settled that this duty to instruct extends to defenses 'if it appears . . . the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citations.]" (*People v. Brooks*, *supra*, at p. 73.) "When assessing the sufficiency of evidence to warrant an instruction, we do not evaluate the credibility of witnesses, a task for the jury." (*People v. Baker*, *supra*, at p. 252.)

Before jury deliberations, defendant requested the trial court to give CALCRIM 505 on self-defense and CALCRIM 506, as modified, on defense of habitation. Defense counsel argued that modified CALCRIM 506 was necessary to explain to the jury the law applicable when a homeowner uses deadly force against a home intruder. The proposed modified CALCRIM 506 instruction is based on CALCRIM 506, with the word, "homeowner" substituted in place of the word, "defendant." Defense counsel also added the last paragraph of the instruction to state that a defendant has a right to self-defense when a homeowner's attempt to kill an intruder is unjustified.[3]

---

[3] Defendant's proposed modified CALCRIM 506 instruction states:

*[footnote continued on next page]*

21

Defense counsel argued CALCRIM 506 was necessary because of the rebuttable

presumption that a resident fears imminent death or great bodily injury during a home

invasion. This presumption is stated in CALCRIM 3477. The prosecutor argued the

defendant's proposed instructions were unnecessary and would confuse the jury. The

trial court rejected CALCRIM 506 and 3477 on the grounds the burglary and robbery

were continuing crimes and the facts did not support the instructions. The trial court

added that it would not give the presumption instruction, CALCRIM 3477, because it did

---

"A *homeowner* may kill or attempt to kill to defend himself or any other person in the homeowner's home. Such a killing is justified, and therefore not unlawful, if: 1. The *homeowner* reasonably believed that he was defending a home against an intruder who violently, [or] riotously, [or] tumultuously tried to enter that home intending to commit an act of violence against someone inside; 2. The *homeowner* reasonably believed that the danger was imminent; 3. The *homeowner* reasonably believed that the use of deadly force was necessary to defend against the danger; AND 4. The *homeowner* used no more force than was reasonably necessary to defend against the danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The *homeowner* must have believed there was imminent danger of violence to himself [or] someone else. [The] *homeowner*'s belief must have been reasonable and he must have acted only because of that belief. The *homeowner* is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the *homeowner* used more force than was reasonable, then the killing or attempted killing was not justified.

"When deciding whether the *homeowner*'s beliefs were reasonable, consider all the circumstances as they were known to and appeared to the *homeowner* and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the *homeowner*'s beliefs were reasonable, the danger does not need to have actually existed.

"A *homeowner* is not required to retreat. He is entitled to stand his ground and defend himself and, if reasonably necessary, to pursue an assailant until the danger of death or bodily injury has passed. This is so even if safety could have been achieved by retreating.

"The People have the burden of proving beyond a reasonable doubt that the attempted killing was not justified. If the People have not met this burden, you must find the Defendant acted in self-defense you must find the defendant not guilty of attempted murder [or] manslaughter." (Italics added.)

22

not fit the circumstances of the instant case, and it did not matter whether A.C. or defendant and his cohorts fired first because the evidence showed that there was a barrage of gunfire against A.C.

### 1. *Self-Defense*

"Traditional self-defense applies where the defendant believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and believes the acts which cause [or attempt to cause] the victim's death are necessary to avert the threat, and these beliefs are objectively reasonable." (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357.)

Defendant contends that the trial court should have given CALCRIM 505 (self-defense) and modified CALCRIM 506 (defense of habitation), because A.C. entered his own home with his gun drawn. Defendant argues that A.C. stormed into his house, playing "the role of vigilante," with "weapons trained on the intruders." While this is a colorful and dramatic version of the incident, there is very little, if any, evidence to support such facts. There was little, if any, evidence that A.C. unlawfully entered his own home, using excessive, unjustified force. Defendant argues A.C. did not have the right to enter his home with a loaded gun and fire it at defendant and his cohorts. But the unrefuted evidence shows A.C. lawfully entered his home with his gun drawn for self-protection, with the knowledge the burglars might still be in his home. While it might have been more prudent to call the police, A.C. had the right to enter his own home, and it was not unreasonable or unlawful for him to retrieve his gun for protection, since he

23

had just observed burglars in his home and was a security guard with extensive training in using a gun.

Furthermore, there is no evidence that defendant reasonably acted in self-defense when A.C. entered his home. Rather, substantial evidence showed that defendant and his cohorts were lying in wait for A.C. to enter his home, and when A.C. entered, they fired a barrage of bullets toward him, causing A.C. to quickly retreat from his home. While there was evidence A.C. may have fired a single round during the ambush, there was little, if any, evidence A.C. was unjustified in doing so, or that A.C. unlawfully initiated the exchange of gunfire, or that defendant and his cohorts were justified in firing 23 rounds at A.C., from four guns. Regardless of whether A.C. fired first, fired a return gunshot, or fired at all, there is little, if any, evidence that defendant and his cohorts acted in reasonable self-defense, out of fear of imminent bodily injury, when they sprayed A.C. with bullets.

In addition, defendant and his cohorts set in motion the events leading to the shooting. Because they were responsible for creating the dangerous circumstances leading to the shooting incident, they cannot rely on self-defense. (*People v. Randle* (2005) 35 Cal.4th 987, 1001 (*Randle*).) Defendant and his cohorts unlawfully entered and burglarized A.C.'s home, and when A.C. alerted them to having been seen in his home, defendant and his cohorts remained in A.C.'s home, and ambushed him when he entered his home. (*People v. Curtis*, *supra*, 30 Cal.App.4th at p. 1357.)

24

"It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.]" (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) A.C.'s entry into his home, with his gun drawn, not knowing if the burglars were still in his home, was legally justified. It was undisputed defendant and his cohorts set in motion these circumstances leading to the shooting incident. Therefore, the trial court did not abuse its discretion in rejecting defendant's self-defense instruction.

Defendant responds that, regardless, when there is no legal justification for the victim's attack, a defendant is entitled to defend himself and others. (*Randle*, *supra*, 35 Cal.4th at p. 1002.) But there was no evidence that A.C. was unjustified in lawfully entering his home with his gun draw for protection. There was also little, if any, evidence that A.C. was the aggressor who initiated the shooting incident. It is unlikely he would have initiated a gun battle since he was alone and he would have reasonably believed there might have been at least two burglars inside. Furthermore, the evidence shows that defendant's cohorts immediately fired at A.C. when he entered. It can be reasonably inferred they were lying in wait for A.C. to enter, and had prepared to ambush him. Under these circumstances, in which there was little, if any, evidence of justified self-defense and overwhelming evidence demonstrating that defendant and his cohorts

25

ambushed A.C., there was no abuse of discretion in the trial court not giving a self-defense instruction.

 2.  *Defense of Habitation*

We conclude the trial court did not abuse its discretion by rejecting defendant's modified version of CALCRIM 506.  As discussed above, there is no evidence A.C. unlawfully entered his house with his gun drawn, after observing burglars inside his home.  There also was little, if any, evidence A.C. was the aggressor when he entered his home and was immediately sprayed with bullets from four guns and at least 23 rounds.

The defense of habitation instruction, CALCRIM 506, is intended to be used by a defendant claiming the right of protection of his own home and those in his home, not by a home intruder, such as defendant.  CALCRIM 506 and the self-defense instruction, CALCRIM 505, are founded on subdivision (2) of section 197, which provides that homicide is justifiable when committed by someone "in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein."  (§ 197, subd. (2).)  Subdivision (2) of section 197, clarifies that defense of one's home is not, alone, sufficient to justify intentional use of deadly force.  (*People v. Curtis*, *supra*, 30 Cal.App.4th at p. 1360.)  There must also be a showing that the homeowner acted in self-defense or in defense of another, with a

26

reasonable belief the intruder intended to kill or inflict serious injury on someone in the home. (*Ibid.*)

Section 198.5, known as the "Home Protection Bill of Rights, . . . provides in pertinent part: 'Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.'" (See *People v. Hardin* (2000) 85 Cal.App.4th 625, 633.)

Section 198.5 creates a rebuttable presumption that a homeowner inside his home has a reasonable fear of death or great bodily injury when the homeowner uses deadly force against an unlawful and forcible home intruder. (*People v. Brown* (1992) 6 Cal.App.4th 1489, 1494; *People v. Hardin*, *supra*, 85 Cal.App.4th at p. 633.) Section 198.5 "was enacted 'to permit residential occupants to defend themselves from intruders without fear of legal repercussions, to give "the benefit of the doubt in such cases to the resident, establishing a presumption that the very act of forcible entry entails a threat to the life and limb of the homeowner." [Citation.]'" (*People v. Hardin*, *supra*, at p. 633, quoting *People v. Owen* (1991) 226 Cal.App.3d 996, 1005.)

"For section 198.5 to apply, four elements must be met. There must be [1] an unlawful and forcible entry into a residence; [2] the entry must be by someone who is not a member of the family or the household; [3] the residential occupant must have used 'deadly' force (as defined in § 198.5) against the victim within the residence; and [4] finally, the residential occupant must have had knowledge of the unlawful and forcible entry." (*People v. Brown*, *supra*, 6 Cal.App.4th at pp. 1494-1495; see CALCRIM 3477.)

Neither the proposed defense of habitation instruction, modified CALCRIM 506, nor CALCRIM 3477, which describes the rebuttable presumption of a homeowner fearing harm by a home intruder, is relevant because defendant and his cohorts were home intruders, not homeowners. (*People v. Silvey* (1997) 58 Cal.App.4th 1320, 1327.) Defense counsel proposed changing the wording of the instructions to apply to A.C. as the homeowner, but there was insufficient evidence to support the instructions, even as modified. Furthermore, CALCRIM 506 would have likely confused the jury, because defendant was not defending his own residence and A.C.'s entrance into his own home with his gun drawn was not unlawful.

Defendant argues there was evidence supporting his proposed modified defense of habitation instruction. Such evidence, he argues, included evidence A.C. could not have possibly believed the burglars intended to kill or inflict serious injury on anyone in his home, because no one was home during the burglary. Also, A.C. could not have reasonably believed he was in imminent danger, because initially A.C. was outside and not in danger when he discovered the burglary in progress. Therefore A.C.'s use of force

28

against defendant and his cohorts was unnecessary and unjustified. A.C. could have called the police and avoided using force. However, substantial evidence shows that A.C. had the lawful right to enter his home, carrying a gun for protection, and once inside, he reasonably believed he was in imminent danger. He had seen intruders in his home and then, upon lawfully entering his home, he saw defendant in his home and was immediately ambushed with a barrage of bullets. We thus conclude the defense of habitation instruction, CALCRIM 506, even as modified, was unsupported by substantial evidence. Therefore the trial court did not abuse its discretion by rejecting it.

Defendant's reliance on *People v. Watie* (2002) 100 Cal.App.4th 866, 878 (*Watie*), in support of the defense of habitation instruction, is misplaced. In *Watie*, the defendant shot his stepfather, James Lee, through a locked front porch screen security door, believing Lee was about to shoot him. (*Id.* at p. 874.) During the trial, the court instructed the jury on the defense of habitation and self-defense. On appeal, the defendant objected to the instructions on the ground they allowed the jurors to presume Lee was acting in lawful defense of his property, thereby eliminating defendant's theory of self-defense. (*Id.* at p. 876.) The *Watie* court disagreed, holding that "the right of a victim to defend himself and his property is a relevant consideration in determining whether a defendant may prevail when he seeks to negate malice aforethought by asserting the affirmative defense of imperfect self-defense." (*Id.* at p. 878.)

29

The *Watie* court explained that "Here, the jury was confronted with the question of whether defendant's use of deadly force was justified as he confronted Lee on the front porch of Lee's home and whether defendant's unlawful conduct created the circumstances that legally justified Lee's use of force. If Lee had a right to use force to defend himself in his home, then defendant had no right of self-defense, imperfect, or otherwise. The court's instructions on Lee's rights and defendant's right to turn to deadly force correctly stated the law." (*Watie*, *supra*, 100 Cal.App.4th at p. 878.)

Unlike in *Watie*, in the instant case, defendant objects to the trial court *not* giving the defense of habitation and self-defense instructions. The court in *Watie*, concluded the instructions were proper based on factual circumstances quite different from those in the instant case. In *Watie*, there was evidence that the victim had told the defendant to leave, threatened to "'whip his ass,'" appeared to grab a rifle, and pointed the rifle at the defendant, at which point the defendant grabbed a gun from his back pocket and fired at the victim. Also, the defendant testified he believed Lee was going to kill him. (*Watie*, *supra*, 100 Cal.App.4th at p. 873.)

In addition, unlike in the instant case, the defendant was outside the victim's home, on the other side of a locked screen security door and had been arguing with the victim. The defendant was not unlawfully inside the victim's home, was not threatening to enter through the locked security door, and was not committing a burglary or felony with other cohorts inside the victim's home. Nor was there any evidence the defendant ambushed the homeowner victim. Although the court in *Watie* held there was sufficient

30

evidence to support defendant's proposed defense of habitation instruction, in the instant case the trial court reasonably rejected the instruction as unsupported by the evidence. In turn, there was insufficient evidence defendant had a right to self-defense.

*Randle*, *supra*, 35 Cal.4th 987, cited by defendant, is also not on point. In *Randle*, the defendant and an accomplice burglarized a car. A relative of the car owner caught the thieves in the act. The relative and the car owner chased them down and seriously beat the accomplice. The defendant shot the relative and was convicted of second degree murder. (*Id.* at pp. 991-992.) The *Randle* court held that, although the defendant set in motion a series of events leading to the defendant shooting the relative, the defendant's retreat and the relative's recovery of the stolen equipment from the defendant's accomplice "extinguished the *legal justification*" for the relative attacking the accomplice. (*Id.* at p. 1002.) The court in *Randle*, concluded the relative took the law into his own hands by beating the accomplice and used more force than was justified. Therefore the defendant was entitled to argue imperfect defense of others. (*Id.* at pp. 1002-1003.)

The instant case is distinguishable in that there was no evidence defendant and his cohorts retreated or that A.C.'s act of entering his home with his gun drawn was unjustified. On the other hand, there is overwhelming evidence that, after A.C. alerted them that he saw them inside, defendant and his cohorts elected to remain inside A.C.'s home, instead of leaving, and waited for A.C. to enter his home, whereupon they ambushed him with a barrage of bullets, forcing A.C. to retreat from his home.

31

Therefore, unlike in *Randle*, defendant set in motion the circumstance leading to the shooting, and there was insufficient evidence to support instructions on the theories of self-defense and defense of habitation.

IV.

IMPOSITION OF FINES AND FEES

During sentencing in September 2018, the trial court imposed a $300 restitution fine (§ 1202.4, subd. (b)), a stayed $300 parole revocation fine (§ 1202.45), a $120 court operations assessment fee ($40 per count conviction; § 1465.8, subd. (a)), and a $90 criminal conviction assessment fee ($30 per count conviction; Gov. Code, § 70373). The court reserved jurisdiction over victim restitution. After discussing defendant's credits, the court told defendant: "I don't think I stated this yet, but I'm going to also order that you pay a restitution fine in the amount of $5,000 pursuant to 1202.4 and an additional parole revocation restitution fine in the amount of $5,000. That fine is suspended unless parole is revoked." There was no mention of defendant's ability to pay the court-ordered fines and fees, and defendant did not object to them.

Defendant contends, and the People agree, the trial court's order imposing a restitution fine under section 1202.4 is ambiguous because the court initially ordered a $300 restitution fine and stayed $300 parole revocation restitution fine (§ 1202.45). Then, a few minutes later, the court ordered defendant to pay a $5,000 restitution fine and a stayed, $5,000 parole revocation restitution fine, apparently not realizing it had already ordered a $300 restitution fine and $300 parole revocation restitution fine. Defendant

32

also contends the trial court order imposing fines and fees, without determining his ability to pay them, violated his constitutional right to due process under *Dueñas*, *supra*, 30 Cal.App.5th 1157.  Defendant asserts that this court should remand this matter to the trial court for an ability-to-pay hearing to determine whether defendant has the ability to pay the court-ordered fines and fees.

As to defendant's contention the trial court's orders imposing restitution fines are ambiguous and contradictory, we agree.  The trial court inadvertently ordered these fines twice, without realizing when making the second order that the court had already ordered the fines in a different amount.  Even though the minute order and abstract of judgment state the fines were $5,000, it is unclear from the reporter's transcript of the sentencing hearing and the trial court's contradictory oral orders, as to whether the trial court intended to order $300 or $5,000 restitution and parole revocation restitution fines. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385 ["Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls."].)  Because of the inconsistency and ambiguity in the oral pronouncement of the restitution and parole revocation restitution fines, the fines and fees order is reversed to allow the trial court to reconsider and clarify its contradictory oral pronouncement of the court-ordered fines.

We need not address defendant's *Dueñas* challenge, because this case is being remanded for reconsideration of the court-ordered fines. During the resentencing hearing on the fines and fees, the trial court will have the opportunity to address defendant's *Dueñas* challenge.

V.

PRESENTENCE CREDITS

Defendant requests this court to correct the trial court's award of presentence credits. The People agree this should be done. Defendant was in custody from November 30, 2017, until sentencing on September 7, 2018, for a total of 282 days. However, the trial court erroneously awarded defendant only 281 actual days of credit. (§ 2900.5, subd. (a); *In re Watson* (1977) 19 Cal.3d 646, 653-653.) Defendant therefore should be awarded one additional day of presentence credit, for a total of actual credits of 282 days. Defendant was awarded 42 days of section 2933.1 worktime credits. His total credits should therefore be 324 days, instead 323 days ordered by the trial court.

VI.

DISPOSITION

We reverse the trial court's orders imposing fines and fees, and remand the case to the trial court with directions to reconsider the court's inconsistent orally imposed restitution and stayed parole revocation restitution fines. We urge the trial court, when reconsidering the restitution fines, to consider *Dueñas*, *supra*, 30 Cal.App.5th 1157, as applied to defendant's fines and fees.

We also order the trial court to modify its presentence credits order to add one additional day of presentence credit, for a total of 282 days of actual credits and 324 days of total presentence credits.

The judgment is affirmed in all other regards.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:


MILLER

Acting P. J.


FIELDS

J.